## BUNGAY v. GREY.

(Court of Appeals of District of Columbia. Submitted May 8, 1922. Decided June 5, 1922.)

No. 1486.

1. Patents ☞113(7)—Concurrent decision of Office tribunals will be reversed for material error.

Since the statute permits appeals from the Patent Office, and imposes upon the Court of Appeals the duty to determine the merits thereof, that court, while regarding as persuasive concurrent decisions of the Patent Office tribunals, and giving such decisions due consideration and respect, will reverse such a decision, if material error is made to appear.

2. Patents ☞101—Interference claims should be read with reference to disclosure of party who originated them.

Claims in interference should be interpreted with reference to the disclosure of the party with whom they originated, and should not be so restricted as to exclude his construction.

3. Patents ☞101—Interference claims will be given broadest reasonable interpretation.

Claims in interference will be given the broadest interpretation that their terms reasonably will permit.

4. Patents ☞91(4)—Senior inventor held entitled to four of the eight claims in interference.

In interference proceedings involving eight claims for a die for casting metal under pressure, four of which were specific and four general, an exhibit, constructed by one of the parties prior to the date of invention claimed by the other party, *held* to disclose the general claims in issue, but not the special claims, so as to entitle that party to priority as to the four general claims.

Appeal from the Commissioner of Patents.

Interference proceedings between George W. Bungay and Charles M. Grey. From a decision of the Patent Office awarding priority as to all eight counts in issue to Grey, Bungay appeals. Affirmed as to counts Nos. 1 to 4, and reversed as to counts Nos. 5 to 8.

H. D. Williams and W. S. Pritchard, both of New York City, for appellant.

James H. Griffin and J. R. Nolan, both of New York City, for appellee.

ROBB, Associate Justice. Appeal from concurrent decisions of the Patent Office awarding priority to the appellee, Grey.

The invention relates to casting dies, into which molten metal is forced under pressure. In the prior art imperfections had been found at the surface of the casting adjacent to the opening leading into the

die cavity, especially when small cylinders were cast. Since most of these small cylinders were given a high finish, it was extremely diffi-- cult to cast them under former conditions. The discovery that by forcing the molten metal into the end of the tubular mold cavity through a restricted channel, alluded to in the counts of this interference as a gate stricture, the surface of the castings would be made smoother, is the gist of this invention. The counts are eight in number, of which we here reproduce the first, fifth, and eighth, as typical of the two groups:

"1. A die or mold for pressure casting for forming a tubular metallic body, such die or mold having therein a feed duct through which the molten metal is forced under pressure, a distributing chamber or feeding chamber for receiving the molten metal from the feed duct, a narrow annular gate through which the molten metal is forced from the feeding chamber, a tubular mold cavity for forming the tubular body into an end of which the narrow gate opens, the gate being of less cross-sectional area than that of the contiguous part of the mold cavity for the tubular body to be cast, so that a terminal shoulder will be formed upon the end of the tubular body adjacent to the gate, whereby after the casting is removed from the mold or die the boss or projection which has been formed thereon by the surplus metal which was contained within said terminal feeding or distributing chamber may be severed or cut off from the end of the tubular body at a point adjacent to said shoulder."

"5. A die for pressure casting having a tubular mold cavity and a flow conduit leading into the annular end thereof through a gate stricture formed to mold a reduced sprue section on the annular end of a tubular casting."

"8. A die for pressure casting comprising a core and separable complementary parts recessed to form a tubular mold cavity around said core and a gate stricture around said core leading into the end of said tubular mold cavity and a flow conduit leading into said gate stricture."

The tribunals of the Patent Office have found, and we accept their finding, that Grey has established conception as to all the counts of the invention in October of 1916, followed by reduction to practice.

As to the first four counts of the issue, Bungay alleges conception and disclosure in January of 1917, and reduction to practice in February of that year, while as to the last four counts he alleges conception and disclosure as of December 15, 1915, with January 1, 1916, as his date of reduction to practice. We accept the ruling of the Patent Office as to the narrow claims, Nos. 1, 2, 3, and 4, that Bungay cannot prevail, owing to the averments of his specification.

We come now to consider the broader counts, Nos. 5, 6, 7, and 8. It was found by the tribunals of the Patent Office, and not seriously disputed, that Bungay's casting die (Exhibit No. 9) was made in January of 1916, and that dental tool handles were successfully cast therein in that or the following month. The first shipment of handles was made on February 2d of that year. This die and handles cast therein are before the court and will be discussed presently.

The Examiner of Interferences was of the view that the terms "gate" and "sprue" have no very definite meaning in the casting art, but that as used in the counts of the issue "sprue" means the solid metal formed in the channels leading to the impression cavity, while "gate" means that part of the channel adjacent to the impression cavity and where the sprue is formed. The Examiner's understanding of the meaning

of these terms has not been questioned. He further found that, after the molding operation in Exhibit No. 9 has been finished, "an examination of the solid formed within the die will reveal a constriction at the juncture of the sprue and the casting proper"; that is, at the end of the "tubular mold cavity" referred to in the counts. The Examiner concluded, however, that, because the constriction in his view "is not exclusively a part of the sprue nor of the casting," the die will not "produce a reduced sprue section on the annular end of the tubular casting." He concedes that as to these four counts the projecting end of the core shapes the interior end of the sprue adjacent to the impression cavity as a cone, and that "in each case, the hollow sprue for a short distance away from the casting proper is thinner walled than elsewhere," and that "this is due to the 'annular gate stricture' in the die." The Examiners in Chief, discussing Exhibit No. 9, admitted "that the sprue has a diameter less than that of the outer end of the handle," but nevertheless held that this reduced sprue section was not molded, "as called for by the counts." The Assistant Commissioner likewise conceded that Exhibit No. 9 discloses a gate stricture, which "may possess substantially the same advantages as the stricture shown in the application drawings," but followed the reasoning of the lower tribunals, and held that this Exhibit No. 9 does not read on the counts of the issue.

[1] We have stated in varying forms of expression that we would follow concurrent decisions of the Patent Office, unless manifest error was made to appear; but the statute permits appeals from the Patent Office, and imposes upon us the duty of determining the merits of such appeals. Recognizing our responsibility, we have not hesitated to disregard concurrent decisions when material error has been found. O'Connell v. Schmidt, 27 App. D. C. 77; Arbetter v. Lewis, 34 App. D. C. 491; Derr v. Gleason, 49 App. D. C. 69, 258 Fed. 969; Laughlin v. Burry, 50 App. D. C. 273, 270 Fed. 1013; Wahl v. Wright, 51 App. D. C. 87, 276 Fed. 455, present term; Goodrum v. Clement, 51 App. D. C. 184, 277 Fed. 586, present term. We are now convinced that, while concurrent decisions of the Patent Office tribunals should be regarded as persuasive and given due consideration and respect, nevertheless if material error has been made to appear, it is our duty, as in any case, to enter judgment accordingly. We therefore overrule prior opinions inconsistent with this view.

[2] The claims under consideration, Nos. 5, 6, 7, and 8, originated with Bungay, and, under recognized rules, should be interpreted with reference to his disclosure. Inasmuch as his die (Exhibit No. 9) was completed and operated long prior to the filing of his application, it must be assumed that the counts were drawn, not only with knowledge of the construction and operation of this die, but with special reference thereto.

[3] Another rule that should be observed in the interpretation of these claims is that claims will be given the broadest interpretation that their terms reasonably will permit. Certainly no arbitrary limitations should be read into them, especially when this would permit a subsequent inventor to reap where he had not sown.

We will now reproduce a drawing of a portion of Bungay's Exhibit No. 9 for casting dental handles:

[4] Claim No. 8 calls for a pressure casting die, and it is obvious that the die shown here is of that type. Claim No. 8 also calls for a core, which in the drawing is marked "D"; the core ending at the shoulder "B." The die also has separable complementary parts and so recessed as to form a tubular mold cavity around the core, as indicated by the letter "C." The gate stricture around the core and leading into the end of the tubular mold cavity is found at "B." The end of the core being "flush with the end wall of the mold cavity," as found by the Assistant Commissioner, the metal necessarily is introduced through a restricted opening. Clearly this opening leads into the end of the tubular mold cavity, and as clearly, notwithstanding the finding of the Assistant Commissioner, is around the end of the core. This gate certainly surrounds the end of the core, for the space is uniform at all points and the casting produced plainly demonstrates this fact. Indeed, if the gate stricture did not extend around the end of the core, the die would not be operative. Moreover, as already indicated, the language of these claims was intended to apply to the structure disclosed by this exhibit, and should be given a practical interpretation.

Claim No. 5 calls for a reduced sprue section "on the annular end of a tubular casting." In claim No. 6 this section is described as "projecting from the annular end of a tubular casting," while in claim No. 7 there must be a "demarcating shoulder at the juncture of the casting and sprue." We already have ruled that the gate stricture found in Exhibit No. 9 actually produced a reduced sprue section at the point called for by these claims, and we are further of the view that this reduced sprue section necessarily projects from the annular end of the tubular casting, as called for by the claims. The demarcating shoulder at the juncture of the casting and sprue clearly appears in the drawing.

It thus appears that, months before Grey entered the field, Bungay

had conceived this invention, had constructed a die that would practice it, and actually had manufactured and sold castings which, in our view, contained all the advantages claimed for this invention. Having in mind that these claims originated with Bungay, and giving them a natural and practical interpretation, we are clearly of the view that they are met in Exhibit No. 9.

It results that the decision of the Patent Office will be affirmed as to counts Nos. 1, 2, 3, and 4, and reversed as to counts Nos. 5, 6, 7, and 8.

Affirmed as to counts Nos. 1, 2, 3, and 4.
Reversed as to counts Nos. 5, 6, 7, and 8.